POYDRAS *vs.* TUSSON.

APPEAL FROM THE COURT OF THE FOURTH JUDICIAL DISTRICT, THE
JUDGE THEREOF PRESIDING.

Where a contract of sale of certain slaves for a fixed price in money, is executed by a notarial act, and the next day the vendee executes a private act to the vendor, in which she proposes to give him certain property in France, for the price of said slaves, if on inquiry the vendor accepts it, and no acceptance is shown, but the property is proved to be of no value: *Held* that these acts import two separate contracts; the first is perfect and executed, and the second of no effect.

A debtor offering to her creditor certain property which is of no value, in payment of a contract, is not entitled to notice of his refusal to accept and receive it. It is equivalent to offering property to which she had no title, and she is in the situation of a drawer of a bill without funds in the hands of the drawee, when notice of protest is unnecessary.

This suit originally commenced in the *via executiva* by the plaintiff, to enforce his demand against three slaves, which he had previously sold to the defendant, for the sum of two thousand two hundred dollars, the payment of which was secured by a mortgage on said slaves.

There is a detailed statement of all the facts of this case, given in the opinion of the court, delivered by judge Martin.

The plaintiff had been twice enjoined, while attempting to proceed with his order of seizure and sale. The district judge cancelled both contracts, and decreed the restoration of the only slave in the defendant's possession, and the return of the price of one she had sold, with some restrictions, &c. From this judgment, the plaintiff appealed.

*L. Janin*, for the plaintiff.

1. The only question which this case presents, is, whether the promise to sell, under private signature, dated February 5, 1826, is binding upon the plaintiff, or in other words, whether it can be considered as having been accepted by him.

2. By the private act, the right of inquiring into the value and situation of the property, was reserved to the plaintiff,

before he was to signify his assent or dissent.   No period was
assigned for the exercise of this right.   It is true that the act
also says, that the defendant promises to execute an authen-
tic sale to the plaintiff " *dans un an ou plus tard à sa volonté.*"
But this does not mean that the plaintiff has only a year to
make up his mind.   It was therefore the duty of the defend-
ant to put the plaintiff *in morâ,* if she wanted to know the
decision on the subject, by offering to perform her part of the
contract.   If the contract had been binding on the plaintiff,
he would have been obliged to pay the eight hundred dollars
at the death of defendant's father.   This occurred in April,
1827.   But the defendant never demanded this sum ; on the
contrary, on July 7, 1827, when she probably knew her father's
death, she asked for indulgence for the debt of three hundred
and forty-two dollars.   She explained herself no more on this
subject than the plaintiff, and insisted on the binding force
of the contract, only after the plaintiff had manifested his
unwillingness to accept it, by bringing suit against her.
Even in her petition and grounds for an injunction, she did
not offer to pass the sale.

3.  A contract for the transfer of real property, whether a
sale, a promise to sell, an exchange or a *dation en paiement,*
must be in writing : until it is reduced to writing, and signed,
it has no legal existence, and the plaintiff never signed the
act under private signature.

4.  The promise to sell the property in France, in payment
of the slaves, was a " *dation en paiement,*" which is not per-
fect without delivery.  *Louisiana Code,* 2626.  Delivery never
took place in this case, and was never offered.  There is very
little doubt that the defendant received the rent of the property,
and while she was receiving them, she knew full well, that
the property had not ceased to belong to her.

5.  It results from the certificate of mortgages and from
Maisonneuve's letter, that there are mortgages on this pro-
perty to the amount of nine thousand francs.  Two of the
mortgages are even posterior to the act of February 5, 1826.
One was given by the defendant on the very day on which
she acquired the property from her father.   These mortgages

she fraudulently concealed from the plaintiff. Had the sale been perfected, this would have been good cause for setting it aside. The certificate of mortgages was indeed not obtained under a commission, but it was annexed to plaintiff's answers to interrogatories, and not objected to, and could it be disregarded, still the plaintiff's declaration, that the property was incumbered to an amount at least equal to its value, would remain.

*Martin, J.* delivered the opinion of the court.

The District Court decides that " the plaintiff made a contract with the defendant, at that time the widow of René Bercegeay, and now the wife of Firmin Duplessis, purporting to be a sale of three slaves, Tony, Silvy and Liza, for the price of two thousand two hundred dollars, on which price defendant was to pay an interest of five per cent. from March 1826, till March, 1827, and after that time an interest of eight per cent. The defendant had a right to protract the payment of the capital, until the death of her father, who resided in France. To secure the fulfilment of this contract, Etienne Tusson, the brother of the defendant, became bound with her *in solido*, the slaves were mortgaged, and defendant also mortgaged a property owned by her at Nantz, in France, in which defendant's father had a usufructuary interest. The notarial act, containing these stipulations, was made on the 4th February, 1826. On the next day after, defendant made an act under private signature, which bears date the 5th February, 1825, but which, both from its internal evidence and the admission of the parties, was in fact executed on the 5th February, 1826. This act is signed only by defendant, and is in the following words : Je soussignée, Louise Tusson, veuve René Bercegeay, demeurant maintenant dans la paroisse d'Iberville, état de la Louisiane, déclare: m'engager, par ces présentes, à passer à Mr. Benjamin Poydras de Lalande, habitant de la paroisse de la Pointe Coupée ; même état, d'ici à un an ou plus tard, à sa volonté, vente authentique de cette portion de la maison vulgairement appellée le Cheval Blanc, située à Nantes, département de la Loire

Inférieure, faisant face aux rues de St. Léonard et du Cheval Blanc; laquelle portion m'est échue dans le partage que mon père, Baptiste Tusson, fit de ses biens le 11 Octobre de l'année mil huit cent vingt-cinq, entre ses quartre enfans et sa femme; cette promesse de vente ainsi faite au dit Sieur Benjamin Poydras de Lalande, qui l'a accepté (sauve information à prendre par lui de l'état de cette portion) pour le prix et somme de quinze mille francs; laquelle somme me sera payée, par le dit Sieur, par la remise de mon obligation hypothécaire, quittancée par lui, que je lui ai consenti hier, quartre du courant, de la somme de deux mille deux cents piastres; et la balance me sera par le dit Sieur comptée à l'époque du décès de mon père, m'obligeant néanmoins de payer au dit Sieur Benjamin Poydras de Lalande l'intérêt à raison de huit pour cent du montant de la susdite obligation de deux mille deux cents piastres, chaque année, à dater de Mars, mil huit cent vingt-sept, jusqu'au décès de mon père : ce qui reste et est entre nous une condition expresse de la présente vente, dont le prix est fixé à la susdite somme de quinze mil francs, en conséquence de cette obligation de ma part. J'approuve l'écriture ci-dessus."

VE. BERCEGEAY.

*Pointe Coupée, le 5 Février,* 1825.

On 24th November, 1830, plaintiff took out an order of seizure and sale, predicated on the notarial act of 4th February, 1826. The sheriff returned that Tony, one of the negroes, was dead; Silvy, another of the slaves, had been sold by defendant, who would give no information where she was; that there remained only Liza to answer to the seizure. Against this order of seizure, defendant filed an opposition containing various exceptions, to which it has become unnecessary to advert. Defendant also filed an opposition to the order of seizure, admitting the purchase of the slaves on the 4th of February, 1826, but setting up the act under private signature of the 5th February, 1826, which she insisted was a part of the contract. That she never intended to purchase said slaves, except in connection with the sale of her

property in France.   That plaintiff had thereby become purchaser of her property in France, the proceeds of which were to be applied to pay off the mortgage, and that the plaintiff by not notifying her of his non-acceptance in a reasonable time, had become bound by the sale.   That her father had died in April, 1827; that the defendant had since received three hundred dollars from plaintiff, and there was a balance of five hundred dollars, for which she prayed judgment.

This injunction was granted by the clerk, under the article of the Code of Practice, which allows injunctions to issue on an allegation of fraud, under oath.

Plaintiff answered this petition, denying the allegations of fraud, and denying the existence of the act under private signature, and claimed the enforcement of the act of mortgage ; the injunction was dissolved at the April term of the court in 1831 ; the reasons of the judgment do not appear. The order of seizure being again let loose upon defendant, on the 9th July, 1831, she obtained another injunction on the same allegations.   To this petition of injunction, an answer in precisely the same terms, was filed ; plaintiff's counsel accounts for the denial of the existence of the act under private signature, by stating that plaintiff was absent, in France, and the counsel himself was ignorant of its existence.

At October term, 1831, defendant put interrogatories to the plaintiff; these interrogatories inquired as to the existence of the act under private signature, of date of 5th of February, 1826.

Whether the defendant did not go to Pointe Coupée to visit plaintiff, for the purpose of selling the property at Nantz ; whether plaintiff did not refuse to give money, but at the instance of plaintiff and defendant's brother, the arrangement was made for slaves ; whether a similar contract was not made with defendant's brother, Etienne Tusson, for his share of the property at Nantz ; whether plaintiff had not stated to defendants, after the order of seizure was taken out, that he had lost or mislaid the act under private signature ; whether plaintiff had taken any, and what steps, to inform himself as to the

property at Nantz. The production of the private act was demanded, and also the production of a letter of defendant in 1826, asking for five hundred dollars, as a payment on the property in France. An interrogatory was also put relative to a claim of defendant against her brother Etienne Tusson, for three hundred and seventy-two francs, placed in plaintiff's hands for collection. To these interrogatories plaintiff answered that the act under private signature was entered into, but that it was not a sale; but a promise to sell. Plaintiff denied that defendant came to Pointe Coupée to sell him her property at Nantz; that she came there to get him to advance her some slaves, which he did, on the terms stated in the public act; that he had great confidence in her brother, whom he took as security; plaintiff denies that defendant was induced by him, or her brother, to take the slaves which plaintiff sold her, as part payment of her property in France; plaintiff refers to the public act, and to the act under private signature, for the contract between them; plaintiff makes a like answer as to the contract between plaintiff and defendant's brother; plaintiff denies any knowledge that defendant would not have bought the slaves, but for the sale of her property in France; plaintiff admits that he told defendant that the act under private signature was lost or mislaid, owing to his change of residence; that he has since found it and left it on file in court; that plaintiff told defendant that he did not attach any importance to it, because he had received information from different persons at Nantz, and particularly from a Mr. Maisonneuve, and from the register of mortgages at Nantz, by which it appeared that her property was burdened with mortgages and other incumbrances, equal to its value; that the plaintiff has shown to her and her husband, the certificates of the register of mortgages; that defendant pretended that some of these mortgages no longer existed, but her assertions did not prevent plaintiff from giving belief to the information he had received; that plaintiff then told her he did not choose to take the property. That he refers to the certificate and letter of Maisonneuve, dated 26th October, 1830, for the information received by him; plaintiff denies

having underrated the collection of the claim of defendant against her brother.     The certificate of the register of mort-gages, states that there existed the following mortgages against Louise Tusson, widow of René Bercegeay, formerly living at Nantz, St. Leonard-street : An inscription made on 13th October, 1825, resulting from an obligation, dated 11th October, 1825, in favor of Potery and two other persons, for five thousand francs, with semi-annual interest, due in 1829 ; also a mortgage against J. B. Tusson, the father, and defend-ant as widow of René Bercegeay, who had been clerk in some public office, as a security, *in solido*, for two thousand francs.     A third mortgage is in favor of the minister of state for seven hundred and twelve francs.     The letter of Maison-neuve describes the defendant's property as of the value of from six to seven thousand francs, and incumbered

With  mortgages  to  Potery................for  5,000
With  mortgages  to  Huard.................for  2,000
With  mortgage  in  favor  of  Brian...........for  1,000
With  one fourth of a life annuity of  four  hundred
    francs per annum, equal to a capital of.........  1,000
                                                      ———
                                        Francs  9,000

The letter of Maisonneuve is dated in October, 1830, and describes the property as in bad condition.

From this evidence, it is impossible to say what the property is worth.

The contract between these parties took place in February, 1826, and between those dates there is room for considerable fluctuation in value.     It militates against the apparent good faith of defendant, that she appears to have acknowledged a mortgage on this property, on the 11th October, 1825, to which no allusion is made in the contract of February, 1826.     This mortgage was made on the same day on which defendant acquired her title by the partition made by her father, between his wife and four children.

The defendant gives no explanation of these incumbrances. Connected with the answer in the interrogatories, plaintiff produces, as the letter called for by the defendant, a letter

from her to plaintiff, dated the 3d August, 1826, in which defendant says, that since her visit to him, when he had promised to execute a duplicate of the writing passed between them, she had received no news from him. She then requested to borrow from him the sum of three hundred dollars ; and as to the rent of the negroes, she begs him to say whether he would exact it that year, or whether *he would take it in balance*, which would suit her better. There are some other letters from her, and in particular one in 1827, begging for further indulgence, at the rate of interest agreed upon in this act ; whether this refers to the note given in August, 1826, for the three-hundred dollars then borrowed on the previous act of February, 1826, is not very clear. It appears that a similar sale of negroes, and contract under private signature had been made between plaintiff and Etienne Tusson, the brother of defendant, for slaves, and in relation to E. Tusson's share of the property at Nantz, on like terms and conditions, the only difference being in price, which is two thousand four hundred dollars, Etienne Tusson being owner of a different portion of the house. This private act is on the same sheet of paper with that signed by defendant, and was by plaintiff admitted in evidence.

The District Court decreed, that the contract of sale from Benjamin Poydras de Lalande, to the defendant, Louise Tusson, dated 4th February, 1826, be rescinded and annulled, and the mortgage given by defendant on her property in the house called the Cheval Blanc, being a house situated at the corner of St. Leonard and Cheval Blanc streets, at Nantz, in France, be cancelled ; and also that the private act from defendant to plaintiff, of date February 5th, 1825, but actually executed on the 5th February, 1826, being a promissory or conditional sale of said property by defendant to plaintiff, be also annulled, and defendant be restored to her rights therein ; that the defendant, Louise Tusson, restore to Benjamin Poydras de Lalande the slave Liza, now in her possession ; and that Benjamin Poydras de Lalande receive from Louise Tusson the sum of seven hundred dollars for the slave Silvy, sold by her, with interest at five per cent. from this date ;

but that before he take out execution for this sum, he file in this suit a release of any claim to said slave ; but that, if he do not choose to do so, that his right to enforce the payment of the sum of seven hundred dollars, with interest as aforesaid, by the sale of said slave Silvy, in an hypothecary action, be reserved to him ; that Benjamin Poydras de Lalande pay the costs of suit up to the present time, but that defendant pay any future costs to be incurred after notification of this decree. The plaintiff appealed.

It is contended, on the part of the defendant, that the notarial act, and the private one, are evidence of *one* contract, viz : one of exchange of the slaves for the property in France. That the plaintiff had the faculty of declining to take the property in France, after he had taken information of its value and condition. That, as there is no evidence of his having notified the defendant of his intention to insist on the payment for the slaves in money, according to the notarial act, (except his issuing the order of seizure and sale after upwards of five years had elapsed) he must be considered as having determined to take the property in France in exchange for the slaves. That neither the letter of the plaintiff's agent, nor the certificate of the recorder of mortgages, which it includes, are legal evidence of the alleged dilapidation or incumbrances. That the District Court might have declared that the plaintiff had made his election to take the property in France in exchange, and could not afterwards resort to the order of seizure and sale. He cannot, therefore, complain of the decision of the District Court, cancelling the whole contract, and placing the parties in their original situation.

We are of opinion that there were *two* distinct contracts ; one of sale, evidenced by the notarial act : this was an absolute and executed contract. This was accompanied by an offer of the defendant to the plaintiff, to give him the property in France in exchange for the slaves, if after being informed of its value and condition the plaintiff was willing that the contract of sale should be resolved into one of exchange.

The plaintiff, in answer to interrogations of the defendant, calling on him to say what steps he had taken to ascertain

*Where a contract of sale of certain slaves for a fixed price in money, is executed by a notarial act, and the next day the vendee executes a private act to the vendor, in which she proposes to give him certain property in France, for the price of said slaves, if on inquiry the vendor accepts it, and no acceptance is shown, but the property is proved to be of no value : Held, that these acts import two separate contracts : the first is perfect and executed : and the second of no effect.*

the condition and value of the property in France, has sworn
he employed Maisonneuve to make the inquiry, and that the
result of it was that the property was in a state of great dilapi-
dation, and mortgaged for several sums of money, the aggre-
gate amount of which exceeded its value, according to the
certificate of the recording officer.

The agent's letter and certificate were annexed to the
answer of the plaintiff. The answer being uncontradicted,
and the facility with which it must have been so, if the facts
were otherwise, allow no ground to doubt of the correctness
of the statement.

The plaintiff and defendant resided at no great distance
from each other ; and the idea cannot be easily entertained
that the plaintiff withheld the information he had received
from the defendant, in the hope of obtaining a bargain if
circumstances changed. The defendant cannot well be sup-
posed to have been ignorant of the mortgage which incum-
bered her property. There cannot be any difference between
offering for sale property thus situated, and offering that to
which she had no title. She was then in the situation of the
drawer of a bill on a person in whose hands there is no fund.
To such drawer, notice of protest is unnecessary, because it
would be useless, as he had no funds to withdraw. It is not
extraordinary that the plaintiff did not secure the evidence
of his having notified the defendant of a circumstance which
cannot be supposed to have been unknown to her. His
delay to enforce compliance with the terms of the contract of
sale, is rather evidence of his indulgence towards a female
debtor, whom it is always painful to coerce, than of an expec-
tation that circumstances might turn out which would make
it his interest to take the property in France; and relinquish
his claim to the money payment.

A debtor offering to her creditor certain property which is of no value in payment of a contract, is not entitled to notice of his refusal to accept and receive it. It is equivalent to offering property to which she had no title, and she is in the situation of a drawer of a bill without funds in the hands of the drawee, when notice of protest is unnecessary.

If the delay and state of suffering, in which it is contended
the defendant was kept in, created any injury to her, she had
at all times the faculty of avoiding the injury, which it is
not presumable she would have neglected ; and if the plain-
tiff was obstinate in withholding his election, she might have
put him *in morâ*. No improper view can, in our opinion,

be imputed to the plaintiff. The defendant, unless she is thought to have been ignorant of the incumbrance which rendered the property worthless, appears to have sought to deceive the plaintiff, in order to protract the payment of the price of the slaves she had purchased. He appears to have been indulgent, as he had hopes that coercion could have been avoided.

·The defendant has had all the benefit she contemplated by the purchase. It does not appear she has suffered any thing by the plaintiff's delaying his demand, and we see no ground on which she may be released from paying the consideration of the sale.

It is, therefore, ordered, adjudged and decreed, that the judgment ·of the District Court be annulled, avoided and reversed ; and that the injunction obtained by the defendant be dissolved, she paying costs, in both courts.